**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RICHARD SUAREZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **No. 05 C 6979** |
| | ) | |
| **KWOKS INTERNATIONAL TRADING, INC.,** | ) | **Judge Rebecca R. Pallmeyer** |
| **d/b/a KWOK'S FOOD SERVICE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Richard Suarez, an Hispanic man born in Mexico, worked for Defendant Kwoks International Trading Inc. (hereinafter "Kwok's") from June 2002 until May 2003, when Kwok's terminated his employment. Suarez sued Kwok's under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging that the company discriminated against him by paying him inadequately, by creating a hostile work environment, and by terminating him on the basis of his Hispanic status and in retaliation for his complaints about prior discrimination.

Kwok's now moves for summary judgment on all of Suarez's claims. Suarez moves to strike portions of Kwok's Reply in Support of Its Motion for Summary Judgment and its Response to Plaintiff's Additional Statements of Fact. For the reasons stated below, this court grants summary judgment in favor of Kwok's on the pay discrimination claim, denies summary judgment on Suarez's other claims, and denies Suarez's motions to strike.

## FACTUAL BACKGROUND[1]

The facts are recounted in the light most favorable to Suarez, the non-movant on this motion for summary judgment.

### Kwok's Owners and Managers

Kwoks International Trading, Inc., d/b/a Kwok's Food Service, was an Illinois corporation, dissolved in August of 2004, that was in the business of selling meats and poultry at wholesale. (Pl.'s LR 56.1 Resp. ¶ 2.)  In June 2002, Kwok's hired Suarez, who is of Mexican national origin, as a sales representative, in an effort to tap into Suaraz's prior experience selling meat to Hispanic-owned businesses.  (*Id.* ¶¶ 1, 11, 13.)  At the time he was hired, Suarez had more than thirty years of experience in the meat industry, (*id.* ¶ 6), and was friendly with two of Kwok's owners, Peter Ng and Christine Chun.  (*Id.* ¶¶ 7-9.)

Peter Ng oversaw all aspects of Kwok's business and also personally purchased and sold meat.  (Def.'s LR 56.1 Resp. ¶ 3.)  Christine Chun, also a manager of Kwok's, was responsible for office administration and human resources functions, including hiring.  (*Id.* ¶ 2.)  Charlie Chun, Christine Chun's younger brother, was the Sales and Operations Manager of Kwok's; he had the power to hire and fire employees.  (*Id.* ¶¶ 1-2; Ng Dep. 16:22-17:7.)  Louis Ng's role at Kwok's is disputed, but Suarez notes that in its response to his EEOC charge, Kwok's successor admitted

<hr>

[1]    The facts below are drawn from the parties' Local Rule 56.1 statements and attachments. Defendant's Statement of Material Facts in Support of its Motion for Summary Judgment will be cited here as "Def.'s LR 56.1 Stmt.," and Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment will be cited as "Def.'s Mem."  The portion of Plaintiff's Rule 56.1(b)(3) Response to Defendant's Statement of Material Facts and Additional Facts Warranting Denial of Summary Judgment that responds to Kwok's Local Rule 56.1 Statement will be cited here as "Pl.'s LR 56.1 Resp.," and the portion that introduces new facts will be cited as "Pl's LR 56.1 Stmt."  Plaintiff's Response to Defendant's Motion for Summary Judgment will be cited as "Pl.'s Resp." The Defendant's Local Rule 56.1(a) Response to Plaintiff's Statement of Additional Facts will be cited here as "Def.'s LR 56.1 Resp."  Volume II of Suarez's Appendix Submitted in Opposition to Motion for Summary Judgment, which contains his documentary exhibits, will be cited as "Pl.'s App," except that Exhibit Two of Suarez's Appendix, which is a letter supplementing his answers to interrogatories and his required disclosures, will be cited as "Pl.'s Supp."

Louis Ng was a manager and owner of Kwok's. (EEOC Charge of Discrimination, Pl's App. Ex. 1, DEF0107 ¶ 4; Charles Austin Limited's EEOC Response, Pl's App. Ex. 1, DEF0112 ¶ 4.) Louis Ng apparently exercised supervisory authority over workers in the shipping and receiving areas of the warehouse; Charlie Chun testified that Louis Ng "watched over the warehouse, the shipping and receiving" and "[made] sure that no one was doing something that they weren't supposed to [do]." (Charlie Chun Dep. 69:16-19.)

Peter Ng, Louis Ng, and Christine Chun are of Asian origin. (Answer to Am. Compl. ¶ 8.) Suarez asserts that apart from him, all the office staff at Kwok's were of Asian descent while he was employed there, (Suarez Dep. 48:10-12), and Kwok's has not denied this. (Def.'s LR 56.1 Resp. ¶ 6.) The parties agree that the "great majority" of Kwok's employees who worked "on the floor"—that is, in the warehouse and the area where chickens were deboned—were Hispanic, and that the majority of Kwok's employees worked on the floor. (Def.'s LR 56.1 Stmt. ¶¶ 46, 48; Pl.'s LR 56.1 Resp. ¶¶ 46, 48.)[2]

Suarez's wages were $1,250 per week throughout the time of his employment at Kwok's. (Pl.'s LR 56.1 Resp. ¶ 15.) He contends that he was initially promised $1300 per week, but never received this amount. (Suarez Dep. 28:6-17.) Suarez contends that he was also promised a $20,000 year-end bonus, (*id.* at 30:4-6), but did not receive it. (Pl.'s LR 56.1 Resp. ¶ 16.) It is undisputed, however, that the amount of Suarez's compensation at Kwok's was based entirely on its business needs, and had nothing to do with his Hispanic status. (*Id.* at ¶ 20.)

**Plaintiff's Evidence of Harassment**

Suarez testified that, while he worked at Kwok's, Peter Ng regularly referred to his Hispanic employees, including Suarez, as "chaquetons," a Spanish term which Suarez renders into English as "jagoff." (Suarez Dep. 62:22-63:9, 136:11-21; Pl.'s Supp. 2.) Peter Ng also regularly referred

_____

[2]    Neither party has offered more specific data concerning the numbers of Asians, Hispanics and other employees working at Kwok's during the relevant period.

to both Suarez and other Hispanic employees as "stupid." (Suarez Dep. 136:15-21; Pl.'s Supp. 2.) This conduct continued into April of 2003, during which Suarez claims that Peter Ng called him "chaqueton" twice and "stupid" a few times. (Pl.'s Supp. 2.) Suarez further testified that Charlie Chun also regularly referred to Hispanic employees as "chaquetons." (Suarez Dep. 141:2-7.) Suarez estimates that Christine Chun overheard this language four to five times per month between January and April of 2003. (Pl.'s Supp. 2.)

According to Suarez, Louis Ng called Hispanic workers abusive names every day that he was at work. (Suarez Dep. 132:23-133:4.) He regularly called Suarez and other Hispanic workers "stupid Mexicans," (*id.* at 124:1-125:13), announced to the workers in the shipping department that "Mexicans are stupid," (*id.* at 162:21-24) and referred to Suarez using the terms "chaqueton" and "bendejo," which is a Spanish-language term for "asshole." (*Id.* at 129:1-7.) Louis Ng did not speak Spanish at work aside from these terms of abuse. (*Id.* at 125:21-22.) Christine Chun was present on at least five occasions when Louis Ng referred to Hispanic workers in the shipping department in a derogatory way. (*Id.* at 161:9-20.) Charlie Chun also witnessed Louis Ng making offensive comments to Hispanics at least once a week. (Charlie Chun Dep. 165:8-17.) Furthermore, Suarez contends, and Kwok's admits, that Louis Ng raised his voice at the Hispanic workers, and never did so towards the Asian employees. (Suarez Dep. 164:16-18; Def.'s LR 56.1 Resp. ¶ 16.)

Suarez testified that Christine Chun used the term "bendejos" very liberally with Hispanic employees at Kwok's, but never with non-Hispanic employees. (Suarez Dep. 192:15-20.) She called Suarez "bendejo" once in February, once in March, and three times in April of 2003. (Pl.'s Supp. 2.) She also frequently called him "stupid," including during April of 2003. (*Id.*)

Kwok's admits that neither Peter Ng, Christine Chun, nor Charlie Chun ever heard or uttered any negative comments towards the Asian employees of Kwok's. (Suarez Dep. 137:4-7, 140:5-7, 141:11-17; Def.'s LR 56.1 Resp. ¶ 16.) Suarez testified that, as a result of the harassment at Kwok's, he experienced emotional anguish, a loss of self-confidence and self-worth, and marital

difficulties.  (Suarez Dep. 147:10-22.)

Suarez made a number of complaints regarding the work environment at Kwok's.  He frequently asked Louis Ng to stop making derogatory comments about his race and national origin, to no avail, although there is no record evidence as to when these complaints occurred.  (Suarez Dep. 190:10-17.)  He complained to Christine Chun about Louis Ng's behavior in late January or early February of 2003.  (Pl.'s Supp. 1.)  He also told both Christine Chun and Peter Ng that Louis Ng's behavior was so severe that it had caused Suarez's brother, Armando, to quit work at Kwok's, although he does not recall when this ooccurred.  (Suarez Dep. 170:8-172:6, 184:23-186:20.)  Furthermore, he asked Christine Chun to stop calling him "stupid" and "bendejo" on two or three occasions, (*id.* at 191:7-17, 193:18-24, 195:1-11), including in March and April of 2003.  (Pl.'s Supp. 2.)

**Suarez's Termination**

In early May of 2003, Christine Chun cancelled service on Suarez's work cell phone, and instructed him to use his desk phone instead.  (Suarez Dep. 50:5-52:12.)  At the same time, Kwok's also suspended the use of a credit card Suaraz used for business expenses.  (*Id.* at 50:4-5.)  At that time, or soon afterwards, Suarez took the laptop computer purchased for him by Kwoks and went home.  (Suarez Dep. 52:16-24.)   He had perfect work attendance until that point and a good performance record.  (*Id.* at 176-1-8; 187:19-188:6; Ng. Dep. 78:24-79:3)

Suarez did not return to work at Kwok's.  The reason his employment ended is disputed.  Peter Ng testified that Christine Chun said Suarez told her he was working from home, but would return soon, and that "nobody fire[d]" Suarez.  (Ng. Dep. 56:3-6; 65:2-3.)  Suarez claims that after he had been absent for Kwoks for more than two days, Christine Chun called him at home, told him that there was "no chemistry" between Suarez and the business, and told him, in effect, that he was fired.  (Suarez Dep. 114:13-14; 187:6-18.)  Chun herself recalls that she first became aware that Suarez was not working from reports from Kwoks's customers.  (Chun Dep. 79:15-82:2).  She does

not remember whether she had any conversations with Suarez after his departure.  (*Id.* 82:14-19.) Kwoks nevertheless asserts that it terminated Suarez's employment because he failed to return to work for more than two days.  (Def.'s LR 56.1 Stmt. ¶ 73, citing Ng Declaration ¶ 8.)  Charlie Chun, Kwok's sales and operations manager, admitted, however, that although there were no "specific guidelines," Kwok's would ordinarily impose a brief unpaid suspension, not termination, as discipline for an initial unexplained absence.  (Charlie Chun Dep. 59: 6-12; 92:3-15, 25.)  Three months after Suarez's departure, Kwoks hired another Hispanic worker, David Centeno, to do some of the work Suarez had done; the rest was absorbed by Peter Ng and Charlie Chun.  (Pl.'s LR 56.1 Resp. ¶ 79.)

**Suarez's Charge**

Suarez filed a charge of race discrimination, national origin discrimination, and retaliation with the EEOC on December 12, 2003.  (EEOC Charge of Discrimination, Pl's App. Ex. 1, DEF0106.)  The EEOC issued a right to sue letter on September 12, 2005, (EEOC Dismissal and Notice of Rights, Pl.'s App. Ex. 1, DEF0111), and on December 12, 2005, Suarez filed this lawsuit against Charles Austin Limited, Kwok's successor,[3] charging that Defendant discriminated against him because of his Hispanic status in the amount of his compensation, in the creation of a hostile work environment, and in his termination, and with retaliating against him for his complaints regarding workplace harassment.  (Compl. ¶¶ 14-18, 19-20.)  On May 1, 2006, Suarez amended his complaint to substitute Kwoks International Trading Inc. as named Defendant.  (Am. Compl.) Kwok's now moves for summary judgment on all of Suarez's claims.  (Def.'s Mot. for Sum. J. 1-2.)

---

[3]    Both parties agree that Kwok's was involuntarily dissolved on August 2, 2004. (Def.'s LR 56.1 Stmt. ¶ 2; Pl.'s LR 56.1 Resp. ¶ 2.)  The court takes judicial notice that Charles Austin Limited was incorporated on August 20, 1999. *See* Illinois Secretary of State, Corp/LLC—Certificate of Good Standing Search Page, http://www.ilsos.gov/corporatellc/index.jsp (last visited Sept. 18, 2007).  Neither party has included a contention in their Local Rule 56.1 statements regarding when the change from Kwok's to Charles Austin Limited occurred.  There is, however, evidence that the company's name was Charles Austin Limited at the time that David Centeno was hired in August of 2003.  (Charlie Chun Dep. 45:16-47:4; Charles Austin Limited Application Form, Pl.'s App. Ex. 1, DEF0098.)  As explained below, *infra* note 10, both Kwok's and Charles Austin had the same managers.

Suarez, in turn, moves to strike substantial portions of Kwok's Local Rule 56.1 Response, multiple sections of Kwok's Reply, and one of its supporting affidavits.

**DISCUSSION**

## I.     Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). To survive summary judgment, Suarez must identify sufficient evidence to sustain each element of the case he must prove at trial. *Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781, 787 (7th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). When considering a summary judgment motion, the court construes the facts and draws reasonable inferences in the light most favorable to the non-movant. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

## II.     Pay Discrimination Claim

In his Amended Complaint, Suarez alleged that he was not compensated properly in his wages and bonus, while non-Hispanic workers were paid appropriately, and that Kwok's created this disparity because of Suarez's race and national origin. (Am. Compl. ¶¶ 11, 16, 18.) Kwok's moved for summary judgment on this pay discrimination claim, on the grounds that (1) Suarez had no evidence that his compensation had anything to do with his Hispanic status, and (2) the pay claim was time-barred. (Def.'s Mem. 9.)

Suarez has apparently waived his pay discrimination claim. In his Response to Defendant's Motion for Summary Judgment, he states in a footnote that he "has not pursued the claim," and therefore declines to respond to Kwok's argument that the claim is invalid. Furthermore, he has admitted, in his Local Rule 56.1 response, that Kwok's determined the amount of his compensation based solely on its business needs, and that his pay had nothing to do with his Hispanic status.

7

(Pl.'s LR 56.1 Resp. ¶ 20.) Such an admission is fatal, because a plaintiff in a Title VII employment discrimination case is required to show that the claimed discrimination occurred "because of" the plaintiff's protected status. 42. U.S.C. § 2000e-2(a)(1) (2000). This means that the plaintiff must show intentional discrimination in a disparate treatment claim, a fact that Suarez has admitted he cannot show with regard to his compensation. *Hildebrandt v. Illinois Dept. of Natural Resources*, 347 F.3d 1014, 1029 (7th Cir. 2003).

Kwok's is entitled to summary judgment on the pay discrimination aspect of Suarez's claim.[4]

## III.    Hostile Work Environment Claim

Suarez alleges that Kwok's violated Title VII by discriminating against him on the basis of his Hispanic status, in that he was called racially offensive names, publicly embarrassed, humiliated, and otherwise adversely treated while at Kwok's. (Am. Compl. ¶¶ 9, 18, 20.) To establish a hostile work environment, a plaintiff must show (1) that he was subject to unwelcome harassment; (2) that the harassment was based upon his national origin or race; (3) that the harassment was so severe or pervasive that it altered the conditions of his employment; and (4) that there is a basis for employer liability. *Velez v. City of Chicago*, 442 F.3d 1043, 1047 (7th Cir. 2006); *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 950 (7th Cir. 2005) (emphasizing that the harassment may be either severe *or* pervasive). Kwok's contests Suarez's ability to prove each of these elements, (Df.'s Mem. 6-8), but, as explained below, the court concludes that this claim survives summary judgment.

### Unwelcomeness

---

[4]     Because the unequal pay claim is dismissed on its merits, the court need not address Defendant's assertion that the claim is barred as untimely, because any decision regarding his compensation was made more than 300 days prior to the filing of his EEOC charge. *See* 42 U.S.C. § 2000e-5(e)(1); *Ledbetter v. Goodyear Tire & Rubber Co.*, ___ U.S. ___, 127 S.Ct. 2162, 2169-72 (2007) (charge must be filed within 300 days of the date on which compensation was determined on allegedly unlawful basis).

First, a hostile work environment claim requires proof that the plaintiff was subject to unwelcome harassment—in other words, that he found the conduct subjectively unpleasant. Evidence that particular words or conduct constitute unwelcome harassment can include the plaintiff's testimony that the putative harassment made him uncomfortable, evidence that the plaintiff complained about it, and a lack of evidence that the plaintiff encouraged or invited the behavior. *See Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007) (listing such evidence as the basis for finding a genuine issue of material fact with respect to the unwelcomeness prong).

Suarez has produced enough evidence to satisfy this burden. First, he testified that the use of derogatory terms such as "stupid" and "bendejos" caused him emotional anguish, made him lose confidence, negatively impacted his self-worth, and created problems in his relationship with his wife. (Suarez Dep. 147:10-22.) Second, he complained about the treatment: He contends that he frequently asked Louis Ng to stop making derogatory comments about his race and national origin, (*id.* at 190:10-17), that he asked Christine Chun to stop calling him "stupid" and "bendejos" on two or three occasions, (*id.* at 191:7-17. 193:18-24, 195:1-11), and that he reported to both Peter Ng and Christine Chun that Louis Ng's behavior was so severe that it caused his brother Armando to quit. (*Id.* at 184:23-186:20.)

Finally, although Kwok's argues that Suarez acq0uiesced to this treatment, (Def.'s Mem. 6), it has not produced evidence that Suarez encouraged the conduct, other than the admitted fact that Suarez himself used profanities in the workplace. (Def.'s LR 56.1 Stmt. ¶ 51; Pl.'s LR 56.1 Resp. ¶ 51; Def.'s Mem. 6.) Although such behavior might be probative of whether the alleged conduct was unwelcome, it is not dispositive; an employee who uses profanity can be the victim of harassment. *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1010-11 (7th Cir. 1994) (fact that plaintiff used "F-word" and other crude language did not indicate a desire to be sexually harassed). Drawing all reasonable inferences in Suarez's favor, as the court must, *Foley*,

359 F.3d at 928, the court is unwilling to conclude that Suarez's own use of profanity requires that summary judgment be entered against him.

**"Because Of" Protected Status**

The second element of a hostile work environment claim is that the harassment must be based upon the plaintiff's protected status—in this case, upon Suarez's Hispanic status or his Mexican national origin. *Spearman v. Ford Motor Co.* 231 F.3d 1080, 1085 (7th Cir. 2000). This element is satisfied by evidence of a mingling of racially-tinged epithets with other hostile words and actions. *See Shanoff v. Illinois Dept. Of Human Servs.*, 258 F.3d 696, 704-706 (7th Cir. 2001) (three racially tinged remarks about the plaintiff's Jewish and Caucasian status, combined with other evidence of hostility, sufficient to establish that harassment was predicated on race). In this case, Suarez has alleged that Louis Ng called him a "bendejos," a "chaqueton," and a "stupid Mexican," (Suarez Dep. 129:1-5), and Louis Ng referred to other Hispanic workers in a discriminatory way every day that he was at work. (*Id.* at 133:3-4.) In addition to this evidence of hostility on Louis Ng's part, there is evidence of the following:

(1)     Peter Ng used the term "chaqueton" towards Suarez, called Suarez stupid, and continuously used derogatory language towards other Mexicans (*id.* at 136:11-138:1);

(2)     Christine Chun called Suarez stupid and "bendejos" on approximately five occasions (*id.* at 191:7-15; Pl.'s Supp. 2); and

(3)     Charlie Chun called Mexicans "chaquetons" "all the time." (Suarez Dep. 141:2-7.)

Taken together, this evidence supports a reasonable inference that the unwelcome harassment directed at Suarez was based upon his status as a Hispanic person and his Mexican national origin.

Kwok's disputes that the contended unwelcome harassment occurred "because of" Suarez's Hispanic status. (Def.'s Mem. 6.) Kwok's argues that Louis Ng's statements, if admissible at all, are not sufficient to establish liability on the part of Kwok's. (*Id.* at 7.) The remaining statements by Peter Ng, Charlie Chun and Christine Chun are insufficient, Kwok's contends, to support an inference of racial motivation. (*Id.* at 6.)

Kwok's challenge to the sufficiency of this evidence requires little discussion. Even if Louis Ng's statements were excluded from consideration, there is sufficient evidence from which a jury could reasonably infer a racial basis in the comments of Peter Ng, Charlie Chun, and Christine Chun. Several statements with a clear racial edge, combined with other harsh conduct, can form the basis of an inference that harassing conduct had a racial basis. *Shanoff*, 258 F.3d at 704-706. Thus, a jury could infer racial hostility towards Hispanics from the evidence that three of Kwok's managers used derogatory Spanish language terms to refer to Hispanic employees, but not to other employees (Suarez Dep. 137:4-7, 140:5-7, 141:4-14), and also called a Hispanic employee stupid on multiple occasions. (*Id.* at 136:17-21, 139:9-16.)

In any event, Suarez has laid an adequate foundation for admission of his testimony that Louis Ng frequently referred to both the plaintiff and other Hispanics as "stupid Mexicans" or proclaimed that "all Mexicans are stupid." All that is needed here (where Louis Ng's comments are obviously not offered for their truth) is a rough description of what Ng said, to whom he said it, and where and when the conversations took place (and the "when" can span many months). *Kemper/Prime Indus. Partners v. Montgomery Watson Americas, Inc.*, No. 97 C 4278, 1998 WL 7498, at *10-11 (N.D. Ill. Sept. 30, 1998); *Houk v. Village of Oak Lawn*, No. 86 C. 139, 1987 WL 7498, at *3-4 (N.D. Ill. Feb. 26, 1987). All of these have been provided by Suarez: Louis Ng called Suarez and other Hispanics "stupid Mexicans," "bendejos," and "chaqueton." (Suarez Dep. 124:3-4, 128:18-129:7, 162:21-163:7.) He did this both in the office, (*id.* at 130:19-23), and out of the office, in the presence of the workers on the shop floor. (*Id.* at 129:8-17.) There is no evidence that Louis Ng used this language in reference to Suarez in the presence of Peter Ng or Christine Chun, (*id.* at 129:18-23), but he did assertedly use such language regarding other shipping department, while in the office on more than five occasion in Christine Chun's presence. (*Id.* at 162:21-163:7.) Such details provide adequate foundation for admission of this evidence regarding Louis Ng's

conduct. Thus, Suarez has produced sufficient evidence to show that there is a material dispute over whether Kwok's management was harassing him "because of" his race and national origin.

**Severity or Pervasiveness**

The third question is whether the harassment was so objectively severe or pervasive that it altered the conditions of Suarez's employment and created a hostile working environment. *Velez v. City of Chicago*, 442 F.3d at 1047. A plaintiff can show a material issue of fact with respect to this element by offering evidence of just a few uses of a reference to plaintiff's race by a supervisor, coupled with other harsh or harassing conduct that was not explicitly racial. *Shanoff*, 258 F.3d at 704-06; *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675-76 (7th Cir. 1993) (two uses of the word "nigger" by plaintiff's supervisor, combined with disparaging remarks about the intelligence of black people, and some other, more ambiguous evidence, sufficed to create a hostile work environment). As described above, Suarez contends that (1) Christine Chun called him "stupid" and "bendejos" on about five occasions, despite being asked to stop (Suarez Dep. at 191:7-9, 195:1-11; Pl.'s Supp. 2); that (2) Peter Ng used the term "chaqueton" about him and used derogatory terms about other Mexicans (Suarez Dep. 136:11-138:1); that (3) Charlie Ng called other Mexicans "chaquetons" on a regular basis (*id.* at 141:2-7); and that (4) Louis Ng routinely called Mexicans, including Suarez, "stupid Mexicans," "bendejos" and "chaquetons," and proclaimed that "all Mexicans are stupid." (*Id.* at 124:3-4, 128:18-129:7, 162:21-163:12.) Even if these comments are not deemed severe, their frequency and pervasiveness satisfies the court that a jury could reasonably find that the united conduct of all four managers created a hostile working environment. *See Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 950 (7th Cir. 2005) (explaining that "there is no magic number of slurs that indicate a hostile work environment").

Kwok's correctly notes that one comment by a supervisor that a subordinate is stupid, by itself, does not support a charge of discrimination. *Massey v. Blue Cross-Blue Shield of Illinois*, 226 F.3d 922, 926 (7th Cir. 2000); *see also Yuknis v. First Student, Inc.*, 481 F.3d 552, 555 (7th Cir.

2007); *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1266 (7th Cir. 1993) (in a wrongful termination case, court noes that "occasional or sporadic use of slurs" and repeated admonishments that plaintiff must "learn to speak English" is not indicative of discrimination.) Here, however, the evidence Suarez proffers involves not a single term of abuse, but a variety of abusive terms, including both the use of Spanish-language derogatory terms by non-Spanish speakers only when speaking to Hispanics, as well as direct comments such as "Mexicans are stupid" and the use of "stupid Mexican" as an epithet. Even if the use of one such phrase may not by itself be actionable, it may be part of a campaign of harassment. Suarez has presented enough evidence of harassment that a reasonable jury could find that his working environment was hostile, and that is all he need do at this stage.

### Employer Liability

Finally, Suarez must show that there is a basis for employer liability with respect to the claimed hostile work environment. "An employer is liable for a hostile work environment either if a supervisor created the hostile work environment, or if a co-worker created the hostile work environment and the employer was negligent either in discovering or remedying the harassment." *Velez*, 442 F.3d at 1047 (internal punctuation omitted). Suarez states a claim under both theories.

First, Suarez presents evidence that Peter Ng, Charlie Chun, and Christine Chun were his supervisors for Title VII purposes. To do so, he must offer evidence that they had the power to "directly affect the terms and conditions of the plaintiff's employment" with respect to hiring, firing, demotion, transfer or discipline. *Id.* Kwok's admits that Peter Ng had the power to oversee the hiring and firing of all employees. (Def.'s LR 56.1 Resp. ¶ 3.) Suarez's contention that Charlie Chun also had the power to hire or fire members of the sales force, (Pl.'s LR 56.1 Stmt. ¶ 1), is also supported by evidence: Asked during his deposition "Who else was in charge of hiring and firing?" Peter Ng responded, "We have three to four people who were in charge," and listed the first of those people as Charlie Chun. (Ng Dep. 16:22-17:7.) Finally, there is a reasonable inference that

Christine Chun may have been Suarez's supervisor. Peter Ng claimed that she had control of hiring and firing for "some of [the employees]," (*id.* at 16:12-14), Kwok's admitted that she was in charge of hiring, (Def.'s LR 56.1 Resp. ¶ 2), and Suarez contends that it was Ms. Chun who actually fired him. (Suarez Dep. 50:11-12, 114:13-14, 187:6-11.)

In light of this conclusion, the court need not reach the question of whether Kwok's is liable for the conduct of Louis Ng, but will address it briefly. Notably, although there is evidence that Louis Ng is a "manager and owner of Kwoks," (EEOC Charge of Discrimination, Pl.'s App. Ex. 1, DEF0107 ¶ 4; Charles Austin Limited's EEOC Response, Pl.'s App. Ex. 1, DEF0112 ¶ 4), Suarez has admitted that Louis Ng was not *his* supervisor, both in his Local Rule 56.1 Response, (Pl.'s LR 56.1 Resp. ¶ 53), and in his deposition testimony. (Suarez Dep. 125:23-4.) Nor has Suarez suggested that Louis Ng had the power to hire, fire, demote, transfer or discipline him. Suarez may still establish employer liability for Louis Ng's conduct, however, if he can produce sufficient evidence that Kwok's was negligent in failing to either discover or remedy harassment inflicted by a co-worker. Defendant admits that Louis was at least a "part-time employee" of Kwok's,[5] (Def.'s LR 56.1 Resp. ¶ 4), so the only question is whether Kwok's was negligent in discovering or remedying his allegedly harassing behavior.

---

[5] Kwok's has exhibited a remarkable level of confusion regarding Louis Ng's role in its operations, particularly given the fact that he is apparently the brother of an owner and manager, Peter Ng. (Ng. Decl. ¶ 10, Date Illegible, Filed Jan. 19, 2007.) After admitting in the EEOC proceedings that he was an "owner and manager" (EEOC Charge of Discrimination, Pl.'s App. Ex. 1, DEF0107 ¶ 4; Charles Austin Limited's EEOC Response, Pl.'s App. Ex. 1, DEF0112 ¶ 4), Kwok's later asserted in its Local Rule 56.1 statement, based on a declaration by Peter Ng, that Louis Ng never worked at Kwok's at all. (Def.'s LR 56.1 Stmt. ¶ 53; Ng Decl. ¶¶ 11-13, Date Illegible, Filed Jan. 19, 2007.) Kwok's reversed itself again in its 56.1 Response, claiming now that Louis Ng was a "part-time employee" (Def.'s LR 56.1 Resp. ¶ 4) based on the testimony of Charlie Chun. (Charlie Chun Dep. 98:5-9.) Perhaps most telling was Charlie Chun's deposition testimony that Louis Ng "basically ran the—I wouldn't say—watched over the warehouse, the shipping and receiving, and just to make sure that no one was doing something they weren't supposed to [do]." (Charlie Chun Dep. 69:16-19.) This purported confusion about the role of an owner's brother is troubling, particularly in light of a defensive strategy that relies significantly on minimizing the role of Louis Ng in management. (*See* Def's Mem. 7-8.)

When an employer is notified of harassment, that employer can be negligent if it does not take appropriate steps to rectify the situation. *See Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 809-10 (7th Cir. 2000). Informally notifying as few as two supervisory employees of incidents of harassment can constitute notice. *Id.* at 803, 809; *see also Phelan v. Cook County*, 463 F.3d 773, 776-778, 786 (7th Cir. 2006) (reports to two supervisors, plus one incident where a third supervisor observed harassment, constitute sufficient notice). Kwok's argues that the notice in this case is insufficient, because Suarez made at most only a "single complaint." (Def.'s Mem. 8.) Suarez, however, points to at least three complaints he made about Louis Ng's behavior: one to Christine Chun about how Louis Ng had called him a "stupid Mexican," (Suarez Dep. 125:8-14), and one each to Christine Chun and Peter Ng explaining that his brother Armando had quit because Louis Ng repeatedly called him a "stupid Mexican." (*Id.* at 185:12-186:14.) Suarez also contends that Louis Ng's harassing behavior often occurred in the presence of both Christine Chun,[6] (*id.* at 161:9-162:24), and Charlie Chun.[7] (Charlie Chun Dep. 165:8-17.) Taken together, this evidence would permit a jury to find that Kwok's had enough information that a reasonable employer might think that it was possible that Louis Ng was harassing Hispanic employees.

Because Kwok's was on notice that Louis Ng behaved in a harassing fashion, it was under a duty to act to remedy his behavior. This, Suarez contends, did not occur. Suarez testified that

---

[6] Kwok's once again raises a foundation objection to this evidence. (Def's Mem. 8.) Suarez's description of the occasions when Christine would overhear Louis Ng make derogatory comments includes the terms he would use ("stupid Mexicans," "bendejos," "chaqueton"); where he would use them (the office area); to whom he was speaking to (workers in the shipping department), and approximately how many times this would occur (more than five). The only element not specified is the time when these conversations occurred, and this can be inferred to be the five to six month period from between when Christine Chun began working at Kwok's and when Suarez's employment ended. Thus, the court finds that there is a basis on which to believe this testimony would be admitted, and therefore the foundation objection is not valid. *See United States v. Prude*, 489 F.3d 873, 878 (7th Cir. 2007); *Houk*, No. 86 C. 139, 1987 WL 7498, at *3-4.

[7] Charlie Chun admitted during his deposition overhearing, about once a week, comments by Louis Ng to Hispanics that were "offensive or negative," though in his view not "derogatory." (Charlie Chun Dep. 165:8-17.)

Christine Chun took no action to address the harassment after his first report, (Suarez Dep. 125:1-5), and that the harassment continued unabated after his complaint. (*Id.* at 149:19-150:1). He contends, further, that Christine witnessed such conduct in February, but that it continued, sometimes witnessed by her, throughout March and April. (Pl.'s Supp. 2.) He asserts that Christine herself called him "stupid" and "bendejo" in March, that he complained at that time, and that she continued to do so during the month of April. (*Id.*) A jury could reasonably infer from the continuation of both Louis Ng's conduct, and the general conduct of management towards Suarez, that management took either no action or inadequate action. *See Phelan*, 463 F.3d at 786 (when complaints are to no avail, this supports a finding of negligence).

The court concludes Suarez has shown these are disputes of fact concerning all four elements of a work environment claim. Therefore, Kwok's motion for summary judgment on that claim is denied.

## IV. Discriminatory Termination Claim

Suarez also alleges that he was discharged for discriminatory reasons. (Am. Compl. ¶¶ 14, 20.) Title VII prohibits an employer from terminating an employee because of his race or national origin. 42 U.S.C. § 2000e-2(a)(1). A Title VII plaintiff can defeat summary judgment on a termination claim in either of two ways: by providing direct proof of discrimination, or by the indirect, "burden-shifting" method that originated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Brewer v. Bd. of Trustees of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). For reasons discussed below, the court concludes that the disputes of material fact preclude summary judgment in Defendant's favor under the direct method. Before presenting that analysis, however, the court notes the parties' confusion on the question whether Suarez was terminated at all. Each side has managed to simultaneously argue both that Kwoks did, and did not, terminate Suarez. Confusingly, Kwoks claims both that it terminated Suarez after he failed to return to work, (Def.'s LR 56.1 Stmt. ¶ 73), and that it did not fire him. (*Id.* ¶ 75.) Matters are made worse because

Suarez denies both statements, effectively contending simultaneously that he was, and was not, fired. (Pl.'s LR 56.1 Resp. ¶¶ 73, 75.) Because both parties have directed its attention to evidence that Kwok's terminated Suarez's employment, the court concludes Suarez can establish this element of his claim. (Ng Decl. ¶ 8, Date Illegible, Filed Jan. 19, 2007; Suarez Dep. 50:11-12, 114:13-14, 187:6-11.)

To show that his termination violated Title VII under the direct method, Suarez must demonstrate either by direct evidence or a "convincing mosaic" of circumstantial evidence, that the termination occurred because of intentional discrimination by the decisionmaker. *Phelan v. Cook County*, 463 F.3d 773, 779 (7th Cir. 2006). Relevant evidence can include evidence of suspicious timing, as well as evidence of behavior towards members of the protected class, especially when proximate in time to the termination. *Id.* at 781-82. Also relevant is evidence that suggests that the proffered reason for the termination is a pretext. *See id.* at 782; *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 905 (7th Cir. 2006).

When a plaintiff presents (1) substantial evidence of significant harassment, in which his supervisors have participated, leading up to and until the time of his termination, coupled with (2) evidence suggesting that the proffered reason for his termination is pretextual, his claim survives summary judgment. *Phelan*, 463 F.3d at 781-82; *Sylvester*, 453 F.3d at 905. In *Phelan*, the plaintiff was the victim of an ongoing campaign of verbal and physical sexual harassment, in which members of the human resources staff and her supervisor participated. 463 F.3d at 782. The hearing officer selected to preside over plaintiff's termination hearing had also made discriminatory comments, and a subsequent an internal review concluded found that the claimed basis for her termination was unjustified. *Id.* On the basis of this evidence, the court concluded that a grant of summary judgment was inappropriate. *Id.*

Suarez presents a similar mosaic of circumstantial evidence. As discussed above in the hostile work environment section, he has produced substantial evidence of workplace harassment

of Hispanics, in which Peter Ng, Charlie Chun, and Christine Chun all participated. The name-calling directed at Plaintiff and other workers of Mexican origin continued into April of 2003. (Pl.'s Supp. 2.) As discussed earlier, Suarez contends that Charlie Chun, Christine Chun, and Peter Ng each have control over hiring and firing. As the parties agree that Suarez was terminated in early May of 2003, (Def.'s LR 56.1 Stmt. ¶ 67; Pl.'s LR 56.1 Resp. ¶ 67), the proximity in time of numerous statements evidencing racial animus[8] by those with power over his employment constitutes circumstantial evidence that he was terminated because he is Hispanic. *Phelan*, 463 F.3d at 781-82; *see also Volovsek v. Wisc. Dept. of Agric., Trade and Consumer Prot.*, 344 F.3d 680, 690 (7th Cir. 2003) (holding that an isolated discriminatory comment, which would normally be inadequate to survive summary judgment, is sufficient evidence of discrimination when it occurs within minutes of a termination).

Suarez has also gathered significant evidence tending to show that Kwok's explanation for terminating him is not credible. Kwok's claims that it terminated Suarez for failing to report to work, and for bringing his laptop home when he was not authorized to do so. (Def.'s LR 56.1 Stmt. ¶¶ 70, 73.)[9] Suarez has produced significant evidence that, if believed, supports the inference that this is a pretext. First, Kwok's allegedly cut off service on Suarez's work cell phone and cancelled his credit card expense account prior to his absence, (Suarez Dep. 50:3-12), suggesting hostility toward Suarez before his absence from work. Second, Peter Ng testified that he believed Suarez to be working from home during his absence, and that he expected him to return. (Ng Dep. 56:3-6,

---

[8]    Kwok's argues that the use of Spanish-language obscenities solely towards Hispanic employees should be viewed as merely workplace profanity, without any inference of racial hostility. (Def.'s Reply 5.) Perhaps a jury might draw such an inference, but it is for a jury to do so, not this court. Summary judgment is not an appropriate vehicle for resolving disputes as to the interpretation of ambiguous language. *Phelan*, 463 F.3d at 782.

[9]    Although Kwok's does contend that Suarez had some performance problems while employed there, (Def.'s LR 56.1 Stmt. ¶¶ 40-42), it admits that these problems were not the reason Kwok's terminated Suarez's employment. (Def.'s LR 56.1 Resp. ¶ 30.)

65:2-3.) Third, Charlie Chun testified that it was not Kwok's policy to terminate employees as a first punishment for even unexplained absences. (Charlie Chun Dep. 92:3-18.) Viewing the evidence in the light most favorable to Suarez, there is a dispute of fact concerning Kwok's claim that he was fired for missing "more than two days" of work and for bringing his laptop home.

Kwok's urges, citing *Sun v. Board of Trustees of the University of Illinois*, 473 F.3d 799, 814 (7th Cir. 2007), that his replacement by another Hispanic individual, David Centeno, defeats Suarez's claim.[10] *Sun* does not address this argument, however. *Flowers v. Crouch-Walker Corporation*, 552 F.2d 1277, 1282 (7th Cir. 1977)*,* is sometimes read to stand for the proposition that the indirect method of proving discriminatory termination requires proof the employer replaced plaintiff with someone outside the protected class. More recent Seventh Circuit cases have enunciated the requirements for proof of discriminatory termination without including this extra element. *E.g.*, *Salas v. Wisc. Dept. of Corrs.,* 493 F.3d 913, 922 (7th Cir. 2007) (listing four elements, none of which correspond to the extra language in *Flowers*); *Burks*, 464 F.3d at 750-51 (same).

In any event, to the extent there is any such requirement for claims relying on the indirect, burden-shifting method, it is inapplicable here. *See Bailey v. Binyon*, 583 F. Supp. 923, 928 (N.D. Ill. 1984) (commenting that it would be "absurd" to apply the *Flower* rule to a case where there was convincing direct evidence of discriminatory intent, such as an admission of racial hostility). Though Kwok's replacement of Suarez with another Hispanic employee may weaken the inference of discrimination, it does not defeat Suarez's claim as a matter of law.[11]

---

[10]    Defendant raises this argument while discussing the indirect method, but the court considers the argument here to make clear that it does not bar Suarez's termination claim under the direct method.

[11]    Neither party has explicitly stated who managed Charles Austin Limited in their Local Rule 56.1 Statements or Responses. In his first complaint, Suarez did contend that Peter Ng, Louis Ng and Christine Chun were managers of Charles Austin Limited, (Compl. ¶ 8), and Kwok's, in its

(continued...)

IV.     **Retaliatory Termination Claim**

Suarez's final claim is that Kwok's terminated his employment in retaliation for his complaints about harassing behavior.  (Am. Compl. ¶¶ 12, 14, 19.)  Title VII prohibits employers from discriminating against an employee because he has opposed any practice that violates Title VII.  42 U.S.C. § 2000e-3(a) (2000).  To prevail on his retaliation claim, Suarez must show (1) that he engaged in a statutorily protected activity, (2) that Kwok's took an adverse action against him, and (3) that the adverse action was caused by his protected activity.  *Salas*, 493 F.3d at 924.  Suarez can prove retaliation either directly or indirectly.  *Id.*

The indirect method requires proof that the plaintiff engaged in protected activity, that he was performing his job adequately, that his employer took an materially adverse action against him, and that another similarly situated employee who did not engage in protected activity was not so treated.  *Id.*  Suarez has made no effort to identify similarly situated employees who did not complain of harassment but were treated more favorably.

To proceed under the direct method, Suarez can raise an inference that an adverse action occurred because of protected activity, by showing (1) a protected activity, (2) an adverse action, and (3) causation.  *Salas*, 493 F.3d at 924.  Protected activity includes complaints about harassing treatment based upon a protected characteristic.  *Boumehdi*, 489 F.3d at 792.  at 792-93.  As described above, Suarez has alleged multiple complaints about harassing conduct, including:

(1)     a complaint to Christine Chun that Louis Ng had called him a "stupid Mexican" (Suarez Dep. 125:7-14);

---

[11](...continued)
answer, admitted that Peter Ng and Christine Chun managed that company.  (Answer ¶ 8.)  Furthermore, in his EEOC charge against Charles Austin Limited, Suarez alleged that the same three individuals were managers of that company (EEOC Charge of Discrimination, Pl's 56.1 App. Ex. 1, DEF0107 ¶ 4), and Charles Austin Limited admitted that this was true.  (Charles Austin Limited's EEOC Response, Pl'.s App. Ex. 1, DEF0112 ¶ 4).  Thus, given that the record is devoid of evidence supporting the contention that any other person was a manager of Charles Austin Limited at the time Centeno was hired, this court assumes for the purpose of this motion that both companies had the same management.

(2)       numerous complaints to Louis Ng about his own harassing conduct (*id.* at 190:10-19);

(3)       several complaints to Christine Chun about her use of the words "stupid" and "bendejo" towards him (*id.* at 195:1-2); and

(4)       complaints to both Christine Chun and Peter Ng that Louis Ng had caused Suarez's brother Armando to quit by calling him a "stupid Mexican" (*id.* at 170:15-18, 184:23-186:20).

Furthermore, termination is an adverse employment action. *See O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). Suarez contends that he was terminated (Suarez Dep. 50:11-12, 114:13-14, 187:6-11), so this element is satisfied as well.

Causation is Suarez's final hurdle. Suarez can show that he was fired because of (in retaliation for) his complaints either through direct evidence (*i.e.* an admission) of retaliatory intent, or through circumstantial evidence. *Boumehdi*, 489 F.3d at 792. Relevant circumstantial evidence can include suspicious timing, as well as evidence of behavior toward employees in the protected group. *Id.* If an employee is fired not long after complaining about harassment, the suspicious timing supports an inference of retaliation. *Id.* at 493; *Sylvester*, 453 F.3d at 905. For instance, if an adverse action occurs just one month after complaints about discrimination, a jury can infer intent to retaliate. *Boumehdi*, 489 F.3d at 786-87, 793. In this case, Suarez contends that he complained multiple times about harassing conduct at Kwok's. The first complaint he describes was his complaint to Christine Chun about Louis Ng's behavior, which occurred in late January or early February of 2003—as little as three months before he was terminated. (Pl.'s Supp. 1.) He also contends that he complained to Christine Chun about her own conduct toward him several times in March and April of 2003 (*id.* at 2), meaning that at least some of his complaints to her, about her own behavior, occurred within a month of when she terminated his cell phone service, and then fired him.[12]

---

[12]     Kwok's again objects to this evidence on foundation grounds, (Def.'s Reply 10), but for the reasons explained earlier, the objection is overruled. Suarez has identified both participants in the conversations (himself and Christine Chun); has summarized their contents (he complained

(continued...)

In this case, the inference created by suspicious timing is strengthened by evidence suggesting that Kwok's asserted reasons for firing Suarez were pretextual. *Volovsek*, 344 F.3d at 689-90. As discussed above, Suarez has introduced substantial evidence tending to show that the claimed reason for his termination, his absence from work, is a pretext for discrimination. The combination of somewhat suspicious timing, knowledge of his complaints by the person who fired him, and evidence that the claimed reason for his termination is a pretext, allows a reasonable jury to infer an intent to retaliate.

Kwok's argues that Surarez has admitted retaliation is not the reason he was terminated: To the contrary, Kwok's urges, Suarez "contends that the real reason for his termination was so that Defendant could steal his customers." (Def.'s Reply 9.) Kwok's refers to Suarez's statement that Kwok's "used him because of his contacts and terminated him when he was not needed anymore since in effect Kwok's had stolen [his] customers." (Pl.'s LR 56.1 Resp. ¶ 77.) In the court's view, Suarez's statement is perfectly consistent with his claim that he was terminated for a retaliatory reason. That Kwok's felt free to fire Suarez because it no longer needed him for his client list does not necessarily mean that it would have done so if he had not complained about their harassment of Hispanic employees. Notably, contrary to Kwok's characterization, Suarez never admitted that a desire to steal his customers was "the real reason" for anything. Thus, Kwok's motion for summary judgment on Suarez's retaliation claim fails.

## V.      Suarez's Motions to Strike

Suarez has filed two motions to strike, specifically directed at portions of Kwok's Reply and its response to his Local Rule 56.1 Statement of Additional Facts. Motions to strike are disfavored except when they serve to expedite the work of the court. *RLJCS Enters., Inc. v. Prof'l Benefit*

---

(...continued)
about harassing statements by Ms. Chun and Louis Ng); and has provided general information about when they occurred (in the late Winter and Spring of 2003). The Court infers that the conversations took place somewhere in the workplace.

*Trust, Inc.*, 438 F. Supp. 2d 903, 906-07 (N.D. Ill. 2006).  Because Plaintiff's substantive claims survive summary judgment, his motions to strike are denied as moot.

## **CONCLUSION**

For the reasons explained above, Kwok's  motion for summary judgment (34) is granted on Suarez's pay discrimination claim and otherwise denied.  Suarez's motion to strike (56, 57) are denied as moot.

ENTER:

Dated:  September 25, 2007

_____
REBECCA R. PALLMEYER
United States District Judge